Good morning, ladies and gentlemen. We begin with case number 116949, People of the State of Illinois v. John Barner, agenda number 5. Are you ready to proceed? You may proceed. Good morning, Your Honors. My name is Pamela Rubio with the State Appellate Defender's Office, and I represent John Barner. May it please the Court, in this case, there were many out-of-court statements introduced at John Barner's trial through the use of surrogate witness testimony. The most critical of these statements were the statements made by Sandra Lombados, testified to by ISP Supervisor Edgardo Hovey. Hovey testified to Lombados' statements concerning the 13 loci DNA testing she performed in this case in 2001, which led to Hovey's conclusion that there was a match between the known blood samples of John Barner and the semen stains found in the victim's underwear. That Sandra Lombados performed her 13 loci testing in this case after John Barner was already identified as a suspect is what distinguishes this case from the cases of Leach and Williams. And the introduction of those statements alone is reversible error in this case. Edgardo Hovey was the quintessential surrogate witness. Although he did not do any testing in this case at all, he testified to the following out-of-court statements by Sandra Lombados. He referred to her reports during his testimony and said that her reports indicated that she was asked to perform additional DNA testing on samples in this case, that she used the STR method, the more modern 13-point method, aside from the 5-point method that had previously been done in this case. Was she, was the defendant here a targeted individual under Leach at the time when additional information was being performed? Absolutely. Sandra Lombados, the record shows that Sandra Lombados, when she was performing this additional 13-point test, had the documents, the previous reports from ISP analyst Greg DeDominick. He had done a 5-point test back in 1999. She had those reports. She knew that when she obtained the samples from cell mark of John Barner's known sample, they were labeled with his name. They were identified as having been, quote-unquote, recovered from John Barner. She knew there was a victim in this case. She knew that the comparison that she was making was between John Barner's known sample, somebody that had already been identified using a 5-point match, and she was comparing that blood to the semen stains from a victim's underpants. So certainly, she knew that her statements in her reports would be made for the primary purpose of accusing a targeted individual, who was John Barner. Well, I just want to challenge you on that. Aren't they objective studies that really have no intrinsic or predictable inculpatory value? And what I mean by that is, aren't these reports as likely to vindicate as they are to incriminate? Technically, DNA testing could exonerate an individual, yes. But under the circumstances of this case, a reasonable person in Sandra Lombardo's shoes, who works for ISP as an arm of the police, who had communicated, maybe not her specifically, but the record shows that the Illinois State Police and the Chicago Police Department communicated throughout the investigation. The detectives were the ones who specifically requested back in 1999 that any blood work sent to them be searched through CODIS, that any suspects, any hits be processed for profile. Any person in Sandra Lombardo's shoes would know that her work was being used for the purpose of establishing evidence against a particular suspect. We're not talking about, you know, some analyst in the health department. Going back, they could have analyzed, she could have analyzed, and it could have helped the defendant. Isn't the real testimonial and evidentiary value, doesn't that come in the evaluation of those results in relation to a given suspect? And here are the witnesses who did that, both testified and were subject to cross-examination, weren't they? They did testify and they were subject to cross-examination. But there, Edgardo Hove admitted he did no testing here. His observations were reliant completely on Sandra Lombardo's statements. And that's why this hearsay is so damaging in this case. Is it your position that any testing done by employees of the ISP crime labs is testimonial solely to their association with the ISP? I think it's a fact-specific inquiry and it would be a case-by-case determination. But in this case, in particular, the work performed by ISP analysts was definitely targeted because of what they objectively and subjectively knew at the time they were performing these tests. So I can't say for certain that any time an ISP analyst touches a piece of DNA evidence, it would be considered testimonial. But in this particular case, I believe that we meet the test set forth by this court in Leach under either the accusing a targeted individual test or the primary purpose for establishing a fact potentially relevant for criminal prosecution in the future. Ms. Rubio, is it the policy of the state police not to have the analyst testify? Well, I think it depends. I don't know of any data establishing that policy. But there were seven ISP analysts who testified in this case. So some testify, some don't. I'm not sure how they determine which testify and which don't. But the forensics department of the ISP on their website actually lists as one of their duties to communicate well with one another and to create trustworthy reports for the potential purpose of testifying in court. So they know that that's part of their responsibility. And that duty, again, goes into play in their subjective belief and objective belief in what they're doing at the time when they're testing this material. Especially in this case where we know for sure the Chicago Police Department was the impetus for this testing from the start. But isn't that the case in any testing that they do? I mean, they don't just test things for fun. They're testing them for a purpose. I mean, you have to have some reason to do that. Well, yes, that's true. I'm not sure. In terms of the Illinois State Police Department, they are actually, I believe, not allowed to do DNA testing on any other case other than a criminal investigation because they're an arm of the police, which is another reason why their statements should be considered testimonial. So is there some idea here of kind of imputing knowledge to them because they work for ISP? Is that what I'm getting? Imputing knowledge of their... That they obviously know about the criminal investigation because they're an arm of the police. Not just for that reason. But it's important to note, unlike, for example, a medical examiner like in Leach who doesn't work for an arm of the police, they work for the goal of protecting public health. The purpose of the creation of an autopsy report is quite different than the creation of a DNA profile for comparison in this case between a known named suspect and a sample from a victim. As this court noted, DNA testing is different. It goes to identify who the perpetrator could be and not at all like an autopsy report, which goes to identify how this person died, not necessarily who committed the crime. And so for that reason, that's the main distinction between Leach and this case. And I believe that the facts of this case do meet the tests set forth by this court in Leach that derive from the case of Williams. Because they were... These statements, in addition, not only were they testimonial, but they were also offered for their truth. Like in Leach, these statements were offered without any type of limitation. And in fact, in this case, it was a jury trial. And in Leach, it was a bench trial. And this court in that case found that the statements were offered for their truth. And in this case, we have even more indication that they were offered for their truth because the jury was never instructed on their limited use. The state utilized these statements a great deal in closing argument. And as the five justices in Williams noted, such statements are necessarily offered for their... The fact finder must necessarily assess the truth of the statements on which his conclusions rely. So in other words, the jury could not properly evaluate Hove's opinion without either agreeing or disagreeing with Lombados' and Selmark's statements that he relied exclusively on in reaching that conclusion. And so for that reason, these statements also meet the standard that they are offered for their truth. And because these statements were offered for their truth, and because they were testimonial under either test set forth in Leach, it was error for these statements to come in. And it was... The state cannot prove that the error was harmless beyond a reasonable doubt. Again, this was the linchpin of the state's case. The state referenced the DNA evidence in closing not less than 18 times. The state said that the match corroborated everything that FM told the jury, that it proved beyond any doubt that John Barner is the offender, that it proved the element, the actual element of penetration beyond any doubt, even when as far as to compare the semen in the underwear to be the Superman to John Barner's kryptonite. Said that he couldn't escape the DNA, couldn't get away from it, and then also stressed the statistics relating specifically to the 13 point, the stronger match, referencing the 15 zeros that came behind the number. The fact that the number was in the quadrillions and the rarity of the profile. The state clearly hung its hat on the DNA evidence in closing. And given the state's focus on this DNA evidence, given the great weight that the juries generally place on DNA evidence, and given the fact that the jury was not given any limiting instructions, it was not proven beyond a reasonable doubt that this error was harmless. Does the fact that a part of the defendant's theory of defense was the sexual relations was consensual play into this in any way as far as whether it's harmless or not? Well, the consent defense was actually just, the record shows that John Barner's consent defense was an alternative defense. He attacked the credibility of the DNA evidence. His primary argument was that the state did not prove that he was the offender. Prior to trial, this issue was litigated in a motion in limine, the introduction of the DNA evidence through hearsay testimony. And defense counsel explicitly stated prior to trial, I'm going to be forced to present a consent defense if this evidence comes in. And defense counsel made the same argument again in closing, I'm sorry, in the motion for new trial and said, I was forced to raise a consent defense because this evidence came in and we had to do damage control. It's similar to a Montgomery situation where priors come in, you kind of have to clean it up as much as you can or make the best of the situation. But his primary defense was that the state didn't prove beyond a reasonable doubt that he was the offender. So for that reason, I don't believe that that affects our harmless error analysis in any way. Because these statements, there are no further questions. Because these statements were offered for their truth and because they were testimonial and because they were not proven to be harmless beyond a reasonable doubt, it was a violation of John Barner's constitutional right to confrontation for them to be admitted in trial and this court should reverse his conviction and remand for a new trial. Thank you. Madam Chief Justice and Honorable Justices, may it please the court. My name is Amy Wotroba. I'm an Assistant State's Attorney from Cook County here on behalf of the people of the state of Illinois. I think before I address some factual clarifications that I think should be made about the record, I'd like to first follow up on a question asked by Chief Justice Garmon regarding whether it's defendant's position that any testing done at the Illinois State Police Lab would be considered testimonial.  I think that if this court looks at defendant's arguments, that it is very clear that it is the defense position that any testing of any type of evidence under any circumstances completed at the Illinois State Police Lab or at Selmar would be testimonial. And I would direct this court in the following way. If you look at defendant's arguments, first of all, defendant is arguing that every witness who didn't testify, everyone who touched the evidence and didn't testify should have testified under the Confrontation Clause. So that alone shows that that is the defendant's position. Every single person who touches the evidence in any single capacity with DNA testing must be presented by the people in order to conform with the Confrontation Clause. Secondly, if you look at defendant's individual arguments with respect to different analysts, for example, Tannis Wildhaber and Joanna Olson, who did the original RFLP on defendant's blood standard prior to the CODIS hit, as well as then Sandra Lombados and the Selmar analysts, you'll see that defendant argues that Illinois State Police only does criminal cases, and because of that fact, that alone imputes knowledge on those analysts to know that their testing and their results might be used in a criminal investigation or evidence at trial, and therefore it's testimonial. Defendant also argues that because Selmar is under contract with Illinois State Police, and Selmar knows that the Illinois State Police only does testing in relation to criminal cases, that they also act always, no matter what they're testing, under what circumstances, with that same knowledge, rendering their results and work testimonial. Defendant argues with respect to different types of evidence that might be tested. Defendant argues that the testing of known standards, for example, John Barner's known standard, that an analyst testing a known standard would necessarily know that the reason why they're being asked to do testing on a standard would be to potentially inculpate somebody in a criminal offense. Defendant, then the opposite of a known standard would be an unknown evidentiary standard, and defendant argues that, for example, with a rape kit, if someone is testing vaginal swabs, they would know that those are related to a criminal case and therefore would possibly be used in a criminal case. Defendant even goes so far as to argue that some of the more, what I'll call, ministerial or divorced tasks of some of the analysts, such as entering a CODIS, or excuse me, entering a profile into the CODIS database, that doing that even renders a testimonial situation because the whole purpose behind the database is to investigate crimes. Defendant further argues that anyone at a lab generating a DNA profile of an offender sample would likewise know that the purpose would be to investigate some kind of crime because, again, the purpose of the database is to investigate crimes. And then finally, I would say that defendant's argument that Tannis Wildhaber should have testified demonstrates Tannis Wildhaber was the person who originally got defendant's blood standard at the Illinois State Police. She didn't do any testing on it. She simply preserved it, a portion of it, and passed it on to the DNA section for the actual DNA analysis. I believe Greg D. Dominick referred to her as a pure chain of custody witness at trial. Defendant claims that she should have testified. So no matter what the task and what the circumstances, defendant is arguing that all work related to DNA evidence is testimonial. This is, first of all, not required, a required finding under the current state of U.S. Supreme Court case law. And, in fact, I would say it's contrary to U.S. Supreme Court case law at this point. The first thing I would point this court to would be footnote one in Melendez-Diaz, which specifically says that it's not the case that everyone in the chain of custody must testify. So defendant's entire position conflicts with that. I would also say the defendant's position conflicts with Williams. And I'll get to what the value or what you can take from Williams is hopefully a little bit later. But if you look at the facts of Williams, Williams, it's our position, it's not distinguishable in any constitutionally significant way, factually. First, I would say that in Williams, Selmark did its testing, and that's the testing that was at issue because the prosecution did not call any witness from Selmark. Selmark was acting pursuant to a contract with the Illinois State Police. So Selmark would have known by defendant's logic that they were working on a case related to a criminal investigation. That did not prevent five justices in the U.S. Supreme Court from finding that under those circumstances, it was not a testimonial situation. I'd also note that even in the dissent, the dissenting justices in one point kind of as an aside, point out that nobody thinks that it's significant that Selmark was a private laboratory. And that's the truth. And the state has never argued that. It is true that the Illinois State Police Crime Lab is a state lab. However, their employees are not law enforcement personnel. They're not an arm of law enforcement. They are scientists, perhaps not as easily separated out from the police as, for example, the Office of the Medical Examiner, but separate nonetheless. They are scientists who do their work regardless of the circumstances, regardless of whether it's a suspect case or a no-suspect case, whether it's an evidentiary sample or a known sample. They do their work and analyze their evidence pursuant to established scientific protocols that are developed without any particular case in mind and are developed to be used across the board scientifically, not just with respect to forensic DNA analysis. The protocols are the same even if you're doing some type of DNA analysis in an academic setting, for example. Can I ask you a question? Yes. Obviously, we're going to be talking about the fractured United States Supreme Court and what we can take from that. And certainly this court has recently spoken to that in Leach, attempted to synthesize what we can from the developing case law of the United States Supreme Court. And in Leach, this court identified that the idea of a primary purpose test remains. The dispute is about the definition of that primary purpose. And in that case, in Leach, this court looked at maybe two different definitions and looked at, suggested, or more than that, that one of the definitions would be that the primary purpose is providing evidence in a criminal case and that the alternative definition is that the document was prepared for the primary purpose of accusing a targeted individual. Those seem to be, our court has said that that's how we see this split. And, of course, in Leach, we said the autopsy report met neither one of those tests. In your brief, you conceded, I believe, that this evidence would, in fact, be inadmissible if, in fact, we were to define primary purpose as providing evidence in a criminal case. My question to you then is, would you also concede that perhaps under different facts, this is a hypothetical, under different facts, in fact, the facts show that the primary purpose of the generation of this report was to accuse a targeted individual. Would you agree that that kind of document that met both these tests would therefore be inadmissible? No. I would say that in our brief, I suppose you could call it a concession, we point out in discussing Williams that it's very likely that the four dissenters in Williams under the facts of this case would, based on what they've said, would find that these statements or these reports were prepared with the primary purpose of creating evidence for use in a criminal investigation. I do not necessarily think that that means that they would find a confrontation clause violation in this case. I don't think there's much value in guessing which justices might move over to the other side. I'll point this out. We know now, since Williams v. Illinois, one thing that we do know is that the primary inquiry should be whether something is testimonial. But there's also the secondary inquiry as to whether or not it was hearsay admitted for the truth of the matter asserted. Defendant talks about statements that he claims were offered from the report through Edgar Hovey's testimony. However, if you read Edgar Hovey's testimony, you'll see that what he's actually asked is, generally, was analysis conducted? Was it compared? And he never testifies to what Sandra Lombatos' conclusions are. And he then says, I also conducted the analysis. And then he gets his opinion out there. So it's different than Williams. Are you suggesting that this case is more like the Wilson v. Clark kind of ideas that our court originally, in Williams, won? I'm suggesting that that's a possibility based on Williams. If you remember from Bullcoming, Justice Sotomayor's concurrence in Bullcoming, she pointed out several factual scenarios that she said were not addressed in Bullcoming. One was a technical reviewer scenario where somebody testifies about testing that they did not personally do, but they did have a connection with, as opposed to in Williams where we had an ISP analyst testifying to testing that was done at a different lab. I would argue that because Edgar Hovey is a technical reviewer here, that that might fall under that separate category. And I think it also may fall under what she said was basically the Rule 703 situation, where maybe something is an underlying document that's testimonial, but it's not admitted at trial, and it's not conveyed to the trier of fact. So you're suggesting that this standard that we had done, and I'm just trying to get down the standard. Because my second question would be, isn't this a factual dispute, then, what happens afterwards? But my first question is just so we can agree with what's the standard. In Leach, we said primary purpose, here are two definitions. Now we're going to apply the facts to both these definitions. You're saying that's not enough of an analysis? Well, taking it back, what I'm actually saying is that in Leach, this court was tasked with taking Williams and trying to apply Williams to a distinct factual scenario, autopsy protocols. So I think it was necessary for this court to separate out different tests that then it could apply to factual scenarios. In this case, because it's DNA, I don't actually think that this court needs to do that, because it's been done by the U.S. Supreme Court already. And I think that at the same time, if the court just applies Williams here, it's totally consistent with Leach, because I think this court has recognized that Williams, even though it's a fractured opinion, is the most recent decision out there and does have some value. But I think as a few of the appellate courts, there have been three appellate court cases that have addressed DNA since Williams and Leach, Kendrick, Nelson, and Negron. And I think in two of them, they talk about the fact that, okay, yes, we have Leach, but we don't really even need to look to Leach, because Leach didn't address DNA. Williams addressed DNA. So let's look at Williams and see what we glean from that. And if we look at Williams, we know that whether you call it a Marx analysis or not, whether you want to say that there's a narrow rule of Williams or not, or if you're just looking to reach a decision that's consistent with Williams, the outcome is the same. And I think that that analysis starts with solemnity, because you need – Let me ask you about that. Yeah. I mean, we understand that we have four justices. We have a point of view. We have another four justices who have a point of view. And we have one who clearly rejects both points of view and both dissents reject his point of view. You lead in your brief with solemnity, the one that Justice Thomas's singular idea. Do we need to meet all – do we have to analyze all three tests? No. I think that you could – I do think that you could dispose of the issue just based on solemnity for this reason. One, I mean, if you want to call it a Marx-type analysis, and some courts have and some courts haven't. I think DARE has. There's some federal court decisions that say this is not amenable to a technical Marx-type analysis. The lowest common denominator, for lack of a better term, in all three cases, Melendez-Diaz, Bulkhoming, and Williams, has been solemnity. I'm not sure I understand your logic. I mean, I don't mean to be disrespectful, but, I mean, truly, large subset idea. I'm not sure what you mean by that. I mean, there's only one person who said this, and the other eight have rejected it. So why would we, therefore, need to – why is that the least common denominator? Well, I would disagree that the plurality in Williams completely rejects it. I think the plurality in Williams doesn't think that any forensic lab reports should be subject to the Confrontation Clause. But even if you look through – if you read the plurality in Williams, they do recognize that solemnity – that in the cases that have been decided so far, solemnity was a consideration. So I would say that the plurality, if you're looking – and I think I'm answering it. I know what you're getting at, and this is the way to answer it, is that even with the plurality in Williams, solemnity is part of it. So if you take the fact that four justices in the plurality in Williams do consider solemnity part of the analysis and say that the documents need to be – that the abuses addressed by the Confrontation Clause were those raised by affidavits, prior testimony, those types of formalized documents, plus Justice Thomas's very limited role that that is the sole touchstone, that that gets you to the narrowest singular rationale for affirming in this case. That would be the legal discussion. There are a lot of factual disputes here, quite frankly. I will try to clarify some of them. I think this court now will have the documents that were supplemented, which are the lab report – they're discovery documents, so they're documents that everyone has had since before trial. They are lab reports, case files, including Sandra Lombato's. And you'll see that, one, the actual reports themselves are in no way different from the reports – the Selmark report in Williams. So the report itself is certainly informal. And then the case files are even less formal. They contain electrophorograms. They contain bench notes. Most of it probably isn't even decipherable to a non-scientist. It's not the type of documents that even if, let's say – well, because Edgar Hovey's opinion was based not on Sandra Lombato's report. It was on her case file. So that's another possible way that a few members of the dissent in Williams may, in theory, come over in a future case if the facts were presented, is that those documents may not even qualify under the broader evidentiary purpose because I would submit that no analyst generating the electrophorogram, taking the bench notes, would have any indication that those could ever possibly be admitted into trial as evidence. Again, distinguishing between Melendez-Diaz and Bullcoming were those documents were affidavits, admissible under law for sole evidentiary purpose, and they proved an element of the charge defense. DNA can never prove an element of a charge defense. So if a line is to be drawn as far as facts, I would say you have Melendez-Diaz and Bullcoming on one side and autopsies and DNA on the other. I understand that in Leach this court did, in a way, manner, possibly distinguish DNA from autopsies, but I got the sense that it was, and this would be consistent with Williams, that you were applying Williams, and you were saying that in a case, even in Williams, with DNA evidence, which could point the finger at an individual, it was found to be non-testimonial. Autopsies, even less so, because it's never going to point the finger at an individual. With respect to the facts, I think, first of all, it's the state's position that the only preserved issue is the issue with respect to Sandra Lombardo's report and Edgar Hove's testimony about that. There are several factual clarifications that I think need to be made with respect to the other reports, but because our main position is that those are forfeited and should not even be addressed by this court, and my time is limited, I will limit it to Sandra Lombardo's. Sandra Lombardo's, what you now are able to see clearly with the documents, is that, yes, Sandra Lombardo's retested the evidence using STR. There is absolutely no indication, no support for the argument that she did so at the behest of the police. There is no phone log requesting additional testing. You'll see that there's no evidence submission form. Those things exist when something is done at the behest of the police. Rather, as we've pointed out, this was a time period where profiles were being converted from RFLP to STR because that's the way the databases were moving, and in order to stay in the database, you had to do that. She also did not have defendant's profile when she did the testing. She did the testing, the DNA testing, before Sommark even worked up the profile. So there's absolutely no indication that the facts that defendants say distinguish this case from Williams are present in this case, and therefore the state would submit that given the state of the case law at this point and the fact that I believe any decision this court would make in align with what defendant is asking you to do would not be based on the facts that actually occurred in this case that this court should affirm if it reaches the substantive issue at all. Thank you, Counselor. Just a few quick points. First, with respect to the state's first argument about my position that my argument is a blanket argument that all ISP testing would qualify as testimonial. That may end up being true, but my position is that this court and no court should make a blanket ruling excluding any type of testing or any type of statement from the analysis. We have to apply the test and look at the objective position of the tester, the person making the statement, and follow the standards that were set forth. If you apply that to most situations involving ISP analysts, you will result in a finding that they were for the primary purpose of creating evidence in a criminal case. Again, they're employees of a police agency. In that case, yes, that may place a slightly greater burden on the state. But in this case, there were seven analysts who testified about John Barner's blood testing. All they needed to do was call two more. So it's not that much more of a burden than they're already meeting. Also, they may end up modifying the way they do their testing. Maybe they'll limit it to one or two analysts instead of spreading it out like they do. The bottom line is it's not a blanket argument about all ISP, but it may end up resulting in that most situations like this case will result in testimonial statements. I wanted to touch on Williams quickly. The state says that this case is just like Williams, but there are some very distinguishing characteristics to this case from Williams. The first is that the person who created the DNA profile and entered into CODIS in Williams testified. All the ISP analysts testified. And the person who did the CODIS search testified. The only person who did not testify was the cellmark analyst who created the DNA profile from the victim's vaginal swab. None of the testimonial analysis addressed any samples of the defendant. In this case, all of the testimonial statements involved at issue in this case involved John Barner's standard. And so the role of the analysts there go to, like the Supreme Court in Williams said, there was no sample of a defendant to swap in by malice or mistake. And that can't be said in this case. The other very distinguishing fact is that this case was a jury trial. And the plurality in Williams relied a great deal on the fact that it was a bench trial in Williams and gave the trial judge a lot of, you know, assumed that he knew how to make limited use of the evidence presented before him. He knows how to follow the law. In this case, again, it was a jury, and the jury was not instructed about the limited use of any of these statements. The other thing I wanted to mention about Williams is that there is no majority, as this Court noted. It doesn't need to even actually be followed. I think this Court did an excellent job analyzing Williams and applying it in Leach. But there is no narrowest ground. Justice Thomas' opinion is one out of nine. And, you know, in that case, because it's not actually binding on this Court, you could even go back to Stetchley in determining the solemnity component of it and look to whether the statement was made in a solemn fashion when there were consequences to falsifying statements. And, you know, as I noted in my reply brief, there are FBI quality assurance standards that the United States Supreme Court wasn't privy to in Williams when they were making their analysis that requires that the signature and title accepts responsibility for the content of the report. So if you even wanted to go as far back as Stetchley for the solemnity component. But, again, there's no need to address solemnity because the primary purpose test is what is really at issue in all the cases concerning targeting an individual. And for those reasons, I ask this Court to reverse John Barner's conviction and remand for a new trial. Thank you. Case No. 116949, People of the State of Illinois v. John Barner, will be taken under advisement as Agenda No. 5. Ms. Rubio and Ms. Petrova, thank you for your arguments this morning. We appreciate them. You are excused at this time.